Good morning, your honors. Good morning to the court. My name is Harini Raghupathy from the Federal Defenders of San Diego on behalf of Mr. Gomez, the appellant. Mr. Gomez's conviction must be vacated because the government violated his Fifth Amendment right to due process when it used the circumstances of his silence and his explanatory refusal as evidence against him in violation of Doyle, Bushy Head, and Heard. In Doyle v. Ohio, the Supreme Court held that because Miranda warnings contain implicit assurances that silence will carry no penalty, it would, quote, be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an exclamation subsequently offered at trial. In Bushy Head and Heard, this court has subsequently interpreted Doyle as prohibiting the government's use not only of a defendant's silence, but also of the circumstances of that silence and explanatory refusals. Here, the government violated Mr. Gomez's due process rights when it recalled the case agent, Stephen Fuentes, in its rebuttal case to elicit Mr. Gomez's post-arrest, post-Miranda silence. But your client testified. Correct. Okay. So he did not, in fact, at least at trial, exercise his right to remain silent, and the things with which he was impeached were also statements, not silence. They were not. They were verbal comments, weren't they not? I mean, nobody testified while I asked him a question, and he invoked his Fifth Amendment rights. Correct. That wasn't the testimony that came out at trial. Right. And so the issues were things that he said, not silence, that he maintained. I disagree with that position. Under Bushy Head, so what was used at trial was a statement that Agent Fuentes testified that Mr. Gomez, quote, basically told me he could not talk because they were going to kill his family, and that's on 173 of the ER. And under Bushy Head, that's an explanatory refusal. And what's protected under the Due Process Clause is not only the government's use of Mr. Gomez's silence, but also of his explanatory refusal, his decision not to talk to the agents. And here, Mr. Gomez, during, after he was Mirandized, he said, I'm not going to talk because they're going to kill my family. He used the conjunction because. But that's not a, well, I mean, I guess what I'm wondering under the applicable Supreme Court cases and any cases from this court, whether that is equivalent to saying, I'm not going to talk to you because I have a constitutional right not to talk to you. If someone says, I'm not going to talk to you because I think someone's going to kill my family, or I'm not going to talk to you because it's Tuesday and I never talk to government agents on Tuesday, or I'm not going to talk to you because I can't stand the tie you're wearing, I'm not sure why that, all those things are protected in the way that you're asking them to be protected. Well, I would say that Mr. Gomez's statement is virtually indistinguishable from the explanatory refusal in Bushy Head, which was, I'm not going to say anything. I'm going to get the death penalty anyway. But that's about the case itself, and this is not really about the case. This is about a third party they are going to kill. This is not about the government's going to kill me. Right. But I think in Herb v. Terhune, this court said, it's clearly established federal law in the Ninth Circuit and under the Supreme Court's case law that a suspect can invoke his right to silence through an explanatory refusal. And it used the phrase explanatory refusal. I think this is exactly such an explanatory refusal. So you think any explanation will make it into a Fifth Amendment refusal? So in all my examples, no matter how bizarre the reason is that's stated for the refusal, because I don't like your tie, or I don't talk to women, or whatever the person says that can't be used for impeachment? I hesitate to answer yes to that question, but I don't think we need to get quite that far in this case, because I think it's undisputed here that Mr. Gomez was invoking his Fifth Amendment right to silence. The first question he was asked was, do you want to speak with us and say your story? He says, I can't talk. No, just why can't you talk? Just what? Because no. And the district court found below that that was an express invocation of his Fifth Amendment rights, and the government has conceded that he was invoking his Fifth Amendment right to silence. But if that's true, and I'm just looking at the transcript here, so if that line three, right, where he says, I can't talk, if he had instead said, I'm not going to talk, I have nothing to say, some more definitive declaration, some more definitive invocation of the right to remain silent, right? And as often happens, the agents don't respect that, and they continue to question him. Well, wait, why? You know, let's all get along here. I've got some ‑‑ I can help you out maybe. And there's some extended dialogue. And he finally says two pages later, look, I can't talk to you because they're going to kill my family. You would say that that falls within the rule of bushy head too? Where there's an extended ‑‑ I think, yes, if all of the questions are addressing the central topic of whether the defendant is, in fact, invoking his right, then I think that would be an invocation of the right to silence. I mean, here ‑‑ Why is that just a classic case where you can use, you know, statements taken in violation of Miranda for impeachment purposes? I mean, it happens all the time. Because I think this is the invocation of silence itself. And bushy head makes clear that when we're talking about the invocation of silence itself, that is protected under the due process clause. But bushy head, the statement there, it's not in response to any further interrogation by the government. It's just ‑‑ it's literally, you know, one statement. And it wasn't even in response to any questions. I think the agent there said, before I could even get to the guy and hand him the waiver form, he just blurted this thing out. So how is ‑‑ I just ‑‑ I'm having trouble. I'm sympathetic to your argument because I agree with your reading of bushy head. But I'm trying to figure out, well, how do we distinguish a situation like bushy head? Where there's just a single statement, not in response to any questions, from the hypothetical ITIV where somebody clearly does invoke their right to remain silent. But then there's this extended, you know, colloquy with the agent, which is in violation of, you know, of case law. But why would that fall under the Harris category instead of the bushy head category? I don't ‑‑ that's what I'm having trouble with. Well, I don't think this is a case where it's an extended colloquy. I mean, there's literally ‑‑ it's the fifth time he says I'm going to say ‑‑ or, sorry, my family will get killed. So ‑‑ Just to be clear. Right. You're right. It's not extended. But there's a colloquy. And if we say that this falls under bushy head, I don't see any way to say that the hypothetical I gave wouldn't. Right? Because your rule has to be it's not just the invocation, the words that actually say I am not going to talk, but it's any explanation for the invocation. Right? Well, coupled with ‑‑ I don't think it's just any explanation. If the ‑‑ if there were a situation where the defendant exercised his right, the agents continued to question him, and maybe he made a statement, you know, 20 minutes down the road or something that wasn't coupled to the invocation, I don't think that would be a situation in which the explanatory refusal would apply. I think here he says I can't say anything because my family. So I think it's the invocation coupled with the fact that he's providing a reason for his decision not to speak. Okay. But that's ‑‑ I mean, any statement that is giving the reason for why the person is not going to speak to the agents, you would say that no matter how far down in the transcript it comes, that's covered by the rule in bushy head, right? That's our position, yes. Can you also address whether, in fact, bushy head said that the statement there could not have been used for impeachment purposes? As I understand it, that issue never came up because the government there, in fact, used it in the case in chief. So how do you get us from if you fall under bushy head, not only can you not use it in the case in chief, but you can also not use it for impeachment purposes? Well, bushy head drew on Doyle and said that silence cannot be used for impeachment. So I think bushy head was relying on Doyle, and it's a post‑Doyle line of authority. I think we don't need to ‑‑ I mean, I think that ‑‑ But isn't the default rule that statements, I know you don't agree that this is a statement, but that statements at least can be used for impeachment purposes? Even if they're obtained in violation of Miranda, yes. Yes. Yes. So that's the default rule. Correct. So somehow we would have to conclude that this isn't really a statement, because even though it's a statement, it was an explanation of why he didn't want to say more. And no matter what that explanation, it counts. Yes. Well, I don't think it has to go that far and say no matter what that explanation. I think that here it was the explanation he was invoking his Fifth Amendment rights. So I don't think this is a case where it was just an arbitrary reason he was providing, as you were mentioning before, that it's too zare. I don't feel like it. I think it's undisputed here that he was invoking his Fifth Amendment right to silence. And so in that case, his explanation is part and parcel of the invocation and must be protected, which includes an impeachment use. The government is prohibited from an impeachment use of that statement. And then I wanted to address the issue of harmlessness beyond a reasonable doubt. If this Court agrees that, in fact, there was an error under Bushyhead and under Doyle and Hurd, then the government's burden here would be to prove that the error was harmless beyond a reasonable doubt. And I believe there are four reasons why they can't meet that burden on this record. First, this Court looks at the extent of the improper use of the silence. And here, as in Fiority Gomez, while the quantitative extent of Agent Fuentes' testimony may not have been great, the qualitative extent was the government deliberately recalled an agent who had already testified, in his case in chief, for the principal purpose of eliciting this post-arrest, post-Miranda silence. And the government asked him several questions about that silence, and he used that evidence as the foundation for its argument in closing, where it relied on his silence at three different times to challenge Mr. Gomez's credibility. Credibility about his denial of the knowledge of drugs? Correct. Or what was the thing, though, about the family? So it's a little confusing from the record, but essentially what the government's insinuation, or their argument to the jury, was that Mr. Gomez expressed, invoked his right to silence expressing fear for his family. He would only fear for his family if he knew about the drugs. And so the family statement was inconsistent with his denial of knowledge on the statement. I thought it was for a more broad credibility purpose. Again, I may be misremembering, but I thought that the argument was made, what family? He doesn't have a family. He's a liar. And he's, you know, that it was sort of more generic credibility. I think the government may have, and I can't speak for them, but from the record I think several things were happening. One was that they also elicited testimony on cross for Mr. Gomez that he had no blood relatives in Bakersfield, that his family was in Mexico. And so I think the inference they were attempting to draw was that he said he feared for his family. He has no family in Mexico. He has to be talking about his family. Sorry, he has no family in the U.S. He has to be talking about his family in Mexico. Which would be relevant only if he was involved in the drugs. Right. And he was fearing retaliation from Mexican drug traffickers. I'd like to reserve the remainder of my time, if that's okay. You may do that. Thank you. We'll hear from the government. Good morning. Kyle Hoffman from the United States. I'd like to start off with a statement of the rule from Anderson v. Charles, which is essentially that a defendant who speaks after Miranda warnings has not been induced to remain silent as to the subject matter of his statement. He's not remained silent at all. Under that line of cases, Anderson v. Charles, Achillo v. Sanchez, and Macaluda in this circuit, when there's been a statement after Miranda warnings have been given, it's fair game to use that statement to attack credibility. Sure. If we didn't have Bushyhead, you would win hands down. I agree with you. But Bushyhead seems to be an obstacle, and obviously that's the point you need to address head on. And here's my response, Your Honor. Bushyhead heard that line of cases, I would suggest, first of all, doesn't deal with impeachment in its classic sense, as I think your question to my colleague indicated. Bushyhead, it was introduced in the case in chief from the very beginning, so I don't think you can read that to say we're hereby overruling the line of cases that say. But you agree, though, as counsel said, that the court in Bushyhead explicitly invoked Doyle as the source of. Yes. Right. And Doyle does encompass, does prohibit use for impeachment purposes. Here's how I try to map out the cases, Your Honor. As we were having this discussion, I was thinking Doyle and Carruto, that line of cases are essentially that you can't promise somebody that they won't be penalized for silence, and then they get up on the stand at trial and they offer a story and they say, aha, you didn't offer that story back when you had an opportunity. So that's penalizing their silence. That's not what's happening here because that's not the argument that was made. That's not what was happening in Bushyhead, either? Correct. That's one line of cases. Go ahead. That's the Doyle line of cases that I thought Your Honor was mentioning. Yeah. The Bushyhead line of cases is essentially those aren't even after Miranda. Bushyhead, he was not even Mirandized. Right. They're walking up with a Miranda form. Right. And he says, I'm not talking about that. I'm going to get the death penalty anyway. And then they use it affirmatively in their case in chief. I'd suggest that's very different from where somebody has been put on notice. If you say something, it can be used against you. And then if you look at the transcript of what happened here, he says, I just have to say something. I just want to say something. Listen, listen, listen. I can't talk because they're going to kill my family. He's been warned. If you say something, it's possible to be used against you. And he's nonetheless said something. And that was the basis of the district court's careful parsing of what happened in these brief moments. You know, he's been warned. I think he's invoked, even though I understand why the agent continued to ask him a couple of questions. But he voluntarily said those things. And I would suggest that was not error. It was actually a very careful looking, not only at the record, but at the DVD. So you would say that at line three, where he says, I can't talk. If he had said, I have nothing to say. They will kill my family if I do. And it was all on line three. You would say that you could use that for impeachment purposes consistently with Bushyhead. That is what you've just argued. Well, I'm just trying to play out. Is that really where you're going? Let me see if I understand your Honor's question, first of all. If he had said, I don't want to talk or I can't talk. He made a definitive invocation. I have nothing, just like in Bushyhead, I have nothing to say because they will kill my family if I do. Right. And he's already been warned? Right. And then he gets up on the stand and says something different that's arguably inconsistent? No. He gets up there and he denies knowledge of the drug. Right. But that's what I'm saying is the line of cases that say essentially if you've been warned and nonetheless you make a statement, it can be used for impeachment. Not in the case in chief. Right. I would suggest that that rule still stands. But that's not Bushyhead. So your argument is that Bushyhead is different in two respects, if I understand it correctly. The first is it doesn't deal at all with impeachment. Correct. It's just not about that. And secondly, that there it was un-Mirandized and here it was Mirandized. Correct. And so the combination of those, in your view, makes a difference. Yes. Okay. Yes. It puts it on the Anderson-Ochoa side of the line and not on the Bushyhead-Herd side of the line. Herd is also a case where they use the evidence affirmatively. It was in the case in chief there too? Yes. I mean, is there some specific language in Bushyhead that you're relying on for the notion that the court there would have allowed the? Well, I can't go that far into reading the court's mind for a future case. I admit that. But I am saying that. The holding wasn't there because it wasn't the facts. Correct. Because it just wasn't the facts. It just wasn't the facts. Well, but, I mean, I guess I'm not sure. This seems to me a real close question because the holding is that that explanatory refusal, what is it called, explanatory refusal? That's the term the counsel is using. Whatever the term was. It comes under the Doyle rule. That's what I read Bushyhead as saying. Right. And that's why I was trying to lay out this map for the court as to Doyle, Carrudo, Bushyhead, and Herd. But you've just, with your hands, vindicated two individuals. Well, I think they're different situations. Doyle, Bushyhead follows in a straight line from, Bushyhead follows in a straight line from Doyle. I think that was the, that's how I read the case. And that's why I was wondering, is there some language in here where you think they diverged off and were? Well, in a sense they have to because there's a statement in Bushyhead. And they're not using the silence saying you didn't offer that story way back when, when you had an opportunity to. That's all I'm trying to suggest, Your Honor. And I do think it also makes a difference, a big difference, a huge difference, that it follows a Miranda warning in this case and in the other cases that I'm talking about, Anderson versus Charles. And here, and in Bushyhead, he hadn't even been Mirandized. He wasn't on notice. So that's what I have. It seems to me that hurts your argument. I would disagree. The court there said it couldn't be used, notwithstanding the fact that there hadn't even been this sort of misleading action by the government. Okay. Two points, Your Honor. First, I think it makes a big difference that the defendant is on notice that it can be used. The fact that he then makes a voluntary statement afterwards I would suggest is in our favor to be able to use it, certainly for impeachment. Okay. Whereas, in Bushyhead, he's not on notice. It just offers this up. Okay. So that's the decision I'm trying to make. The second, I would suggest that the district court's reading of what happened after looking at the DVD and reading the transcript was not that this was an underhanded effort by the government agent Fuentes to get the defendant to say something inculpatory when he had already clearly invoked to the contrary that it was very natural for the agent to say, well, you're saying can't. Do you mean you don't or you can't? And that that was the natural reading of what happened. And when he said, I don't want to talk, he stopped. Oh, I agree. But that's fine. But let's say it was slightly different because the next case will be different. Understood. And agents always push the envelope, right? Maybe that's what they're supposed to try to do. But let's say that he makes a much more definitive statement at line three. He says, whatever he says later, I won't talk or, you know. I don't want to talk. Right. And the agent, you know, says, well, what? Why not? We're friends, right? I can help you. I mean, there's some, you know, attempt to soften the guy up. And so there's a more extended dialogue. And then the person finally says, look, no, let me make it clear. I can't do this because they're going to kill me. Right. Well, that, I mean, if I were up in front of Your Honor on that case, I would be arguing that that, for impeachment purposes, if he makes a statement is permissible. Under Harris. Yeah. Now, there have been a lot of other issues raised, and they really weren't raised in my colleague's argument. I know we've all been here a long time, so I don't want to beat my gums for no purpose. If the Court has questions, I'd be happy to try to answer them about any of the other issues. What bothers me about this last answer you've given, though, is that if we adopt your rule, it just seems to me it gives agents a real incentive to not take no for an answer. Why do we want to adopt a rule that just gives them that extra incentive, right? I don't think the Court has to adopt that rule to resolve this case. Let me be sure I understand your argument, because it sounded to me like it was the opposite of suggesting that they couldn't take no for an answer. If he had said, if his first sentence out of his mouth was, I don't want to talk, and the reason is that I fear that my family will be killed in Mexico, and I want you to understand that, and they said, fine, we won't ask you any more questions. So your position is, even if they ask him no more questions, that could be admitted in impeachment because of the prior Miranda warnings? Yes. No, my hypothetical is different. I was saying he says definitively, I am not going to talk, period. And then they continue to question him? Yes, and they extract this statement in violation. I mean, that's all I'm saying is that, you know, we want to draw a firm line that when somebody definitively invokes, we don't want to give agents the incentive of, well, hey, sir, why is that? Are you sure about that? Because they know at least we'll be able to use this for impeachment purposes, whereas if we extend bushy head to this situation, there is no incentive because they're not going to be able to use it, period. Right. Well, one thing I would say, Your Honor, is that, I mean, it really, even though the District Court found there was an invocation early on, I mean, I think if you look at the transcript and the DVD, it's much more ambiguous than that. I can't talk, not I don't want to talk because I'm invoking my rights, and that whatever future agents might do, this agent actually did a pretty nice job of respecting the defendant's rights. So I'm reluctant to offer up a rule to solve a future problem when the agent,  actually, did a pretty nice job of respecting the defendant's rights. I'm sorry that that doesn't solve the Court's problem. Right. We have a bigger problem than this one case. Yeah. So I hope I've done my best to try to answer the Court's questions, and thank you. Thank you. We appreciate that. Counsel, you have some rebuttal time. So I think the Court has kind of hammered in on the fact that this case doesn't squarely fit within the confines of Doyle or Bushyhead, but I think if we return to first principles, what we have, Doyle says, is that you can't promise a criminal defendant that his silence will not be used against him and then use that silence to impose a penalty on him, and Doyle is talking about impeachment. And then Bushyhead comes along and says that when we are mentioning silence in the context of Doyle, we're talking not only about, I'm not going to say anything or just say no, but we're going to include a defendant's statement, her calls it an explanatory refusal. And while Bushyhead may have been dealing with the use in the government's case in chief, it did draw on Doyle, and I would argue then that Bushyhead was incorporating Doyle's, although it didn't apply, it didn't involve a case in which impeachment was an issue, that in this case, Doyle coupled with Bushyhead would prohibit the government's use. Kagan. Does Mirandizing make any difference? I mean, your construct would be, let me just give you a different hypothetical. Full Miranda rights. You understand that absolutely anything you say cannot be used against you in a court of law. Do you understand that? Yes, I understand that. Do you want to talk to us? No. No, but I'd really like to explain why I don't want to talk to you, and you proceed for five pages to tell your whole entire life story. Your view is that that cannot be, even if it's totally volunteered, cannot be used even for impeachment purposes. No matter how irrelevant things, no matter how voluntary, it just can't be used because it purports to explain why I don't want to talk. No, I think that might be a different scenario, because that's not an unambiguous invocation that the defendant's essentially undercutting his invocation by providing this detailed explanation. But here we have an unambiguous invocation, and I think the government counsel alluded to how it may be ambiguous because Mr. Gomez used can't versus don't. But in her, this Court said in footnote 5 that it doesn't matter that the defendant there said that he could not reenact the shooting versus instead of saying would that the Constitution makes no such distinction. And I think the same reasoning applies here. Just because he used the word can't, he may have should have used, he should have used the word don't, doesn't necessarily mean it was an ambiguous invocation. And I think in this case, because it wasn't. Would that matter to the result if we disagree with you, and if we find the initial invocation ambiguous, so that clarifying questions were permissible, and that the actual invocation didn't occur until after these statements, would that make a difference to the answer? Wouldn't it happen? It wouldn't? Because if the invocation came after these statements, how were they part of the silence? Well, because, well, I guess it would depend upon where the court was finding the invocation came. Where he finally says I don't want to talk, and they say fine, what time is it? It's 16 minutes after midnight or whatever. That's the end of the transcript. If we were to find that the only, I'm not saying we would. I'm just trying to understand your position here. If the definitive invocation does not come until after the statement said issue, then wouldn't they be fair game? For any purpose, really. Let's say they talk for half an hour about the crime, and then the person says, you know, I've changed my mind. I'm going to stop talking. And they stop asking questions. All that stuff that came before is admissible, isn't it? The answer is yes. You don't have to worry about it. I'm hesitating to say yes, but I think the answer is yes. Okay. So it may matter to our analysis where the definitive invocation comes. Right. But I would say that counsel pointed out that the district court did watch the DVD and made an informed analysis. And the district court found that the invocation came when he said I couldn't talk. So to the extent this Court owes any deference to the district court, even though it's a de novo standard of review, given that the district court did view the DVD. He can't, too. Correct. I think that the I can't talk would be where the invocation occurred. Thank you, counsel. Thank you. I appreciate your arguments. Both counsel have been very helpful in this challenging case. We appreciate your arguments. The case argued is submitted and we will be adjourned.
judges: Graber, Rawlinson, Watford